946 A.2d 15

**Joan L. FLOYD**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE, et al.**

**No. 1588, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

March 27, 2008.

Reconsideration Denied May 9, 2008.

Joan L. Floyd, appellant, pro se.

George A. Nilson, City Solicitor, William R. Phelan, Jr., Principal Counsel, John A. McCauley, Venable LLP, for appellee.

Panel: KRAUSER, C.J., HOLLANDER and BARBERA, JJ.

HOLLANDER, J.

In this appeal, we must consider, *inter alia*, whether the Board of Directors of the Charles Village Community Benefits District Management Authority (the "Authority"), appellee, properly approved the proposed Fiscal Year 2007 Budget and

Supplemental Tax [1] for the Charles Village Community Benefits District at a meeting on April 11, 2006. The Board of Estimates, acting on behalf of the Mayor and City Council of Baltimore (the "City"), appellee and cross-appellant, subsequently adopted the 2007 Budget when it met on May 17, 2006.

Unhappy with the Supplemental Tax, Joan L. Floyd, *pro se*, appellant and cross-appellee, along with several others, filed a declaratory action in the Circuit Court for Baltimore City on June 5, 2006, against the City and the Authority.[2] The plaintiffs complained that the Authority's Board of Directors (the "Board") lacked a quorum when it approved the 2007 Budget. They alleged that the Board improperly counted towards its quorum three Board members who were ineligible to vote: Michael Gervais, Richard Burnham, and Eric Friedman. Consequently, the plaintiffs sought injunctive relief to prohibit the City "from imposing, collecting, and enforcing any and all Supplemental Tax for fiscal year 2007[.]"

Following a merits hearing on July 18, 2006, the circuit court issued a Declaratory Judgment (the "Judgment") and a "Memorandum Opinion" on July 26, 2006. It upheld the approval of the "FY 2007 budget and property surcharge rate" for the District, and denied plaintiffs' request for injunctive relief. Therefore, the court dismissed the suit, with prejudice.

Plaintiffs subsequently filed a motion to amend or alter judgment, which culminated in an Amended Declaratory Judgment ("Amended Judgment"). Making only a minor revision to its ruling, the circuit court again upheld the validity of the 2007 Budget and Surtax.

---

**1.** We shall sometimes refer to the Supplemental Tax as the "Surtax," and we shall generally refer to the 2007 Budget and the Surtax collectively as the "2007 Budget."

**2.** The Complaint was signed by plaintiffs Joan Floyd, Stephen Gewirtz, and Pamela Wilson. The other plaintiffs named in the caption did not sign the suit. They were Kristen Bush, Mark Gustafson, Richard Gross, Juanita C. Harenberg, Carolyn Heldreth, John A. Houston, F. Ernesto Kellum, Marilyn O'Connor, William M. O'Connor, Ann Shettle, Edith B. Stern, M. Hasip Tuzeer, and Constance Whiting.

This appeal followed.[3] Appellant poses the following questions:

1. (As to Michael Gervais): Did the outgoing 2005 Board have the authority to elect an at-large Quadrant representative for the 2006 Board, and to do so without a quorum present?

2. (As to Richard Burnham): Did an individual, who was neither a registered voter within the district nor an owner of property within the district, lawfully occupy a voting seat on the Authority's Board?

3. When the total number of authorized voting seats on the Authority's Board is nineteen, and the quorum for the conduct of business is a fixed number, must that number be at least a majority, or ten (10)?

4. When the total number of authorized voting seats on the Authority Board is nineteen, and the affirmative vote of "a majority of all of the voting Board members" is required to adopt a Supplemental Tax rate for the coming fiscal year, must there be 10 votes?

In its cross appeal, the City asks six questions. These include:[4]

1. Did the lower court err by entering a declaratory judgment in the absence of a justiciable controversy?

\* \* \*

6. Did the lower court err by failing to exclude those plaintiffs who failed to comply with Maryland Rule 1–311

---

3. Joan Floyd was the only person who signed the notice of appeal. She did so "[o]n behalf of above named *pro se* Plaintiffs," identified as Gewirtz, Kellum, Bush, Gustafson, Hildreth, and Whiting. Thereafter, Floyd submitted an "Addendum to Notice of Appeal," seeking to add Shettle as a *pro se* appellant. As we shall discuss, *infra*, Floyd, Gewirtz, and Wilson were the only proper plaintiffs, and Floyd is the only proper appellant.

4. Because some of the City's questions duplicate the issues raised by appellant, we have set forth only two of the questions presented in the City's cross appeal.

and should this Court dismiss the present appeal as to all appellants except Ms. Floyd? [5]

For the reasons that follow, we shall affirm.

---

5. In her reply brief, and in her capacity as cross-appellee, Floyd poses the following fourteen questions:

I. Is the Supplemental Tax imposed and collected *by default* in the absence of lawful action by the Authority's Board?

II. Did the lower court find Eric Friedman to be a lawful voting member of the Authority's Board, to be counted in the quorum?

III. Was there any basis in law for the business of the Authority's Board to be conducted by less than a majority of its voting member-ship, so as to allow 9 out of 19 voting members to constitute a quorum?

IV. Was there any basis in law for voting members of the Authority's Board to conduct business with less than a quorum so as to appoint Michael Gervais to either the 2005 or 2006 Board, and did the outgoing 2005 Board otherwise have the power to appoint Mr. Gervais?

V. Do the *statutory requirements* for voting Board members provide for an individual "representative" of a property owner when that individual is neither a registered voter within the District nor an owner of property subject to the Supplemental Tax?

VI. Do the By-laws require a mere majority of all *sitting* members of the voting Board to vote in favor or [sic] the Supplemental Tax rate?

VII. Did the lower court err in failing to reach the "mootness" or "cure" issues presented below regarding June 21, 2006?

VII. Was there a quorum of eligible voting members physically present so as to call to order the special meeting of June 21, 2006 and conduct business of any kind, and was the Authority's Board author-ized to convene a quorum and conduct business by conference telephone.

XI. Did the events of June 21, 2006 "ratify" or "cure" the Authority Board's prior unlawful acts of December 13, 2005 and April 11, 2006?

X. Did the Authority's Board have the power to "ratify" or "cure" the Board of Estimates' null and void May 17, 2006 approval of the Supplemental Tax rate and budget?

XI. Is the City's Cross–Appeal subject to dismissal pursuant to Maryland Rule 8–602(a)(1)?

XII. Does Maryland Rule 8–602 call for dismissal of the original Appeal as to all but one of the Appellants?

XIII. Was the lower court entitled to consider each of the Plaintiffs below as being in compliance with Maryland Rule 1–311(a)?

XIV. May the City argue on appeal that the lower court erred in rendering a declaratory judgment?

(Emphasis in original.)

To the extent that appellant's reply brief includes issues not raised in the initial brief, or not responsive to appellees' briefs, we need not

## FACTUAL AND PROCEDURAL SUMMARY

The Authority was established in 1994 by the General Assembly. The Legislature gave the City the power to create up to "six community benefits district management authorities," including the Charles Village Community Benefits District (the "District"). *See* 1994 Md. Laws, Chap. 732, codified at Baltimore City Charter (the "City Charter"), Art. II, §§ 63(a)(1), (d)(1) (the "Enabling Law").

The purpose of the Authority, is to provide certain services to the "business interests and residents" of the District, an area encompassing the greater Charles Village neighborhood of Baltimore City. City Charter, Art. II, § 63(a). These services include the provision of "supplemental security and maintenance" as well as "amenities in public areas" and "park and recreational programs...." City Charter, Art. II, § 63(a)(2). The Enabling Law authorized the City to pass an ordinance creating the Authority, subject to approval by the property owners and registered voters of the District. City Charter, Art. II, § 63(k)(1).

Pursuant to the Enabling Law, the City passed Ordinance No. 94–414 (the "Ordinance") on July 1, 1994, codified at Article 14, Subtitle 6 of the Baltimore City Code (the "Code").[6] It sets forth the powers of the Authority in regard to its operation of the District. In part, the Code states:

### § 6–4. Powers of Authority.

---

consider them. *See Oak Crest Village, Inc. v. Murphy*, 379 Md. 229, 241–42, 841 A.2d 816 (2004) (recognizing that the function of a reply brief is "limited to responding to points and issues raised in the appellee's brief. An appellant is required to articulate and adequately argue all issues the appellant desires the appellate court to consider in the appellant's initial brief."); *State v. Jones*, 138 Md.App. 178, 231, 771 A.2d 407 (2001) ("A reply brief serves a limited purpose.... An appellant is supposed to use the reply brief to respond to the points and issues asserted in the appellee's brief which, in turn, are ordinarily offered by the appellee in response to the appellant's contentions in the opening brief."), *aff'd*, 379 Md. 704, 843 A.2d 778 (2004).

6. Unless otherwise noted, all references to "Code" shall refer to Baltimore City Code.

The Authority shall:

(1) not be or constitute or be deemed an agency of the City or the State of Maryland;

(2) to the greatest extent allowable by law, be deemed a special taxing district, and therefore a governmental body, both politic and corporate, exercising only such powers as are provided for in this subtitle;

(3) not exercise any power specifically withheld by the terms of either the Enabling Legislation or, if more restrictive, this subtitle. However, the powers of the Authority shall be broadly interpreted in order to allow the Authority to achieve the goals of the Enabling Legislation, including the provision of supplemental security and maintenance services, the promotion and marketing of the District, and the provision of amenities in public areas;

\* \* \*

(9) adopt an annual budget and impose, charge, and collect the taxes or charges on benefitted properties within the District authorized by the Enabling Legislation and this subtitle; provided, however, that no taxes shall be levied against properties which are exempt under state law from ordinary property taxes;

\* \* \*

(13) subject to approval of the Board of Estimates, adopt, amend, and modify bylaws, consistent with the Enabling Legislation and this subtitle;

\* \* \*

(17) do all things necessary or convenient to carry out its goals, objectives, and powers.

The Ordinance also provided for the assessment and collection of a supplemental tax on real property located in the District to fund the Authority's operations. The Code provides, in part:

§ 6–8. **Supplemental Tax.**

(a) *Board of Estimates to determine assessable base.*

\* \* \*

(2) Properties subject to the tax shall include all properties within the District except those exempt under this subtitle, the Enabling Legislation, or other applicable laws.

\* \* \*

(b) *Assessment; collection; enforcement.*

(1) The funding for operation of the Authority shall be provided by a supplemental property tax (the Supplemental Tax) on the assessable base of the District as determined in subsection (a).

(2) The Supplemental Tax shall be assessed and collected in conjunction with the property taxes assessed and collected by the City ("Regular Tax"), unless otherwise established by the Board of Estimates.

(3) Enforcement of the Supplemental Tax shall be in accordance with the enforcement of the Regular Tax, and all provisions applicable to the assessments, refunds, credits, collections, and enforcement which apply to the Regular Tax shall apply to the Supplemental Tax unless modified herein.

(c) *Determination of tax.*

The Supplemental Tax rate shall be determined as follows:

(1) Any increase in the rate of the Supplemental Tax must be approved by a majority of the voting Board members.

(2) For the initial budget year, the rate of the Supplemental Tax shall be set to raise revenues equal to the costs of the Financial Plan but shall not exceed a full year rate of 30¢ per $100 of assessed value.

(3) For the first full budget year, the rate of the Supplemental Tax shall be set to raise revenues equal to the costs of the Financial Plan but shall not exceed 30¢ per $100 of assessed value, except that the rate may be adjusted to

produce revenue equivalent to the full year 30¢ yield of the initial budget year.

(4) For any year after the first full budget year, the rate of the Supplemental Tax may be adjusted to yield revenues which are no more than 5% greater than in the prior year.

As noted, the Ordinance did not go into effect immediately upon its passage. Rather, it required approval through a special election. Code, § 6–15 specified the criteria for eligibility to vote in that election.

### § 6–15. Election approval process

(a) *List of eligible voters.*

The Board of Estimates, with the assistance of the interim Board, the Department of Finance, and the Supervisor of the Board of Elections, shall be responsible for compiling a list of those persons eligible to vote on the establishment of the District and on any question relating to its renewal.

(b) *Eligibility criteria.*

The following persons are eligible to vote subject to the limitations that no person may have more than 1 vote:

(1) owners of property within the District which is subject to tax under § 6–8; and

(2) voters registered to vote within the District.

(c) *Election.*

(1) A ballot shall be provided to each eligible voter regarding approval of the establishment of the District and the Authority consistent with this subtitle. . . .

(d) *Percentage approval.*

\* \* \*

(2) If the Board of Estimates determines that at least 58% of the aggregate votes cast approved the establishment of the Authority, the Board of Estimates shall certify the Authority as approved for operation.

Sandra Sparks, Executive Director of the Greater Homewood Community Corporation, Inc., and the "initial Administrator of the Authority," explained that a total of 7,590 ballots

were mailed to eligible voters, which included corporate owners of property. Of all ballots cast and counted (1,578 ballots), 65% voted in favor of creating the District.[7] On January 11, 1995, the Board of Estimates certified the results of the election.

Pursuant to the Ordinance, the Authority "shall be governed by and administered through a Board of Directors." Code, Art. 14, § 6–6(a). The Board is composed of both voting and non-voting members. Code, Art. 14, § 6–6(e). The "number of members of the full Board must be at least 14, excluding vacancies, and no more than 27." Code, Art. 14, § 6–6(d)(1). In particular, there are nineteen authorized voting member positions, including four at-large voting members. Code, Art. 14, § 6–6(e).[8] The Board is also required to include, as non-voting members, two members of the City Council, appointed by the President of that body. Code, Art. 14, § 6–6(e). In addition, the Board is authorized to include four non-voting members from the neighborhood associations bordering the District, and two non-voting members from various non-profit organizations within the District. Code, Art. 14, § 6–6(e).

Further, the Ordinance authorized the Board to adopt by-laws. Code, § 6–6 provides:

## § 6–6. Board of Directors

---

**7.** Some 3,329 ballots were submitted by those who sought to vote. Of those, 1,751 were deemed invalid and not counted. Of the 1,578 ballots that were counted, 1,033 supported the creation of the District, while 545 opposed it.

**8.** Of the voting members, one is appointed by the Mayor, and at least eight shall be from four constituent organizations (the Abell Improvement Association, the Charles Village Community Association, the Old Goucher Community Association, and the Harwood Community Association). In addition, at least six must come from three business organizations (the Better Greenmount Alliance, the Old Goucher Business Alliance, and the North Charles Village Business Association. The Authority's Bylaws, which we discuss, *infra*, designated four at-large voting members by dividing the District into Quadrants ("Quads"). The voters of each Quad may elect a voting Board member. Bylaw 2.07.

\* \* \*

(g) Bylaws, rules, and regulations.

(1) The Board may adopt such bylaws, rules, and regulations as it deems necessary in carrying out the powers of the Authority, so long as the same shall not be inconsistent with the terms of this subtitle or of any ordinance amendatory or supplementary hereof or of the Enabling Legislation.

(2) All bylaws shall be subject to the approval of the Board of Estimates.

(3) The Board may establish its own procedures relating to the internal administration of the Authority, except as may be restricted by the Enabling Legislation or this subtitle.

The Board of Estimates approved the Authority's Bylaws on January 11, 1995, when it certified the election results.[9] At the same time, it approved the Board's initial members.

As we shall see, *infra*, several provisions of the Bylaws are pertinent here:

2.02 *Composition of Board.*

A. The Board of Directors of the Authority must be at least *14*, excluding vacancies, and no more than *27* persons. Subject to limitations prescribed in the preceding sentence, the Board of Directors shall have the full authority to decrease or increase the number of directors. [Italics in original]

B. Unless otherwise required by the Ordinance, the Board shall be subject to the following considerations:

i. At least a majority of the Board shall be composed of owners or representatives of property owners subject to the tax imposed by this subtitle. A voting member of the Board must be eligible to vote in the election under Section 260 of the Ordinance.[10] An owner of property which is utilized

---

9. Since the Authority's creation, the Board has revised the Bylaws on June 27, 1995, May 15, 1996, December 1997, and June 9, 2003.

10. Section 260 of the Ordinance is codified at Code, Art. 14, § 6–15.

for commercial purposes may designate an individual to represent the owner if:

a) The individual is (1) a tenant of the owner, (2) a corporate officer or partner of the tenant of the owner, or (3) a business representative or agent of the owner, and

b) The owner authorizes and designates in writing the individual to represent the owner on the Board.

\* \* \*

2.09 *Vacancies.* In the event of resignation, expiration or other departure from the Board of a member not appointed by an elected official or an association, a majority of the remaining directors, whether or not sufficient to constitute a quorum, may fill a vacancy on the Board of Directors. A director elected by the Board of Directors to fill a vacancy serves until the next annual meeting or such earlier or later time as his successor is elected and qualifies. Vacancies in the members selected by elected officials and associations shall be filled by such officials or associations

2.10 *Meetings.*

\* \* \*

E. Meeting my [sic] conference telephone. Subject to paragraph 2.13 (Open Meeting), *members of the Board of Directors may participate in a meeting by means of a conference telephone* or similar communication equipment if all persons participating in the meeting can hear each other at the same time. Participation in a meeting by these means constitutes presence in person at a meeting. (Emphasis added.)

\* \* \*

2.12 *Quorum and Voting. The actual presence of at least 9 voting members shall constitute a quorum for all regular and special meetings* of the Board of Directors. Each member of the Board of Directors shall have one vote. The

act of a majority of voting members in attendance at a Board of Directors meeting at which a quorum is present shall be the act of the entire Board of Directors. (Emphasis added.)

\* \* \*

5.03 *Supplemental Tax.*

A. The Board shall recommend to the Board of Estimates the supplemental tax rate each year as part of the financial plan. During the process of adopting the financial plan, the Board shall approve the supplemental tax rate in a separate vote different from the vote of the Board for the purpose of adopting the financial plan.

B. The supplemental tax rate must be approved by a majority of all of the voting Board members.

C. For the initial or partial budget year, the rate of the supplemental tax shall be set to raise revenues equal to the cost of the financial plan but shall not exceed a full year rate of thirty cents ($.30) per $1.00.00 [sic] of assessed value. For the first full budget year, the rate of the supplemental tax shall be set to raise revenues equal to the costs of the financial plan but shall not exceed thirty cents ($.30) per $100.00 of assessed value, except that the rate may be adjusted to produce revenue equivalent to the full year 30–cent yield of the initial budget year. For any year after the first full budget year, the rate of the supplemental tax may be adjusted to yield revenues which are no more than five percent (5%) greater than in the prior year.

D. The supplemental tax rate shall remain the same unless a majority of all the voting Board members vote to change it. If a majority of all the voting Board members do not vote to change the supplemental tax rate, then the Board shall submit a financial plan to the Board of Estimates for approval containing the existing supplemental tax rate.

In addition, Bylaw 7.06 provides:

Robert [sic] Rules of Order. All meetings shall be conducted in accordance with the Enabling Law, the Ordinance, and

these Bylaws supplemented where not inconsistent by Roberts Rules of Order, Newly Revised.

The minutes of the Board's meeting on November 8, 2005, indicate that the District held elections for the four Quad members on October 18, 2005, and that Tammy Mayer was elected as the Quad 4 representative. According to the minutes, however, Mayer "has since withdrawn her name from consideration." The Board's minutes of December 13, 2005, indicate that on that date the Board unanimously approved Michael Gervais as the Board representative for Quad 4. The minutes also show nine voting members were present for the vote, including Richard Burnham and Eric Friedman.[11]

According to the evidence, Friedman held the position designated by the Mayor, but did not reside or own property in the District. However, the City, whose interests Mr. Friedman purported to represent, owned property in the District at 2300 and 2324 Maryland Avenue, among other places. Burnham, the Board Treasurer, had been appointed by the Old Goucher Business Alliance. He was the sole owner, president, and representative of Graphic Imaging, Inc., a Subchapter S corporation that owned property in the District subject to the Surtax.

Pursuant to § 5.01 of the Bylaws, the fiscal year of the Authority begins on July 1 and ends on June 30. At a meeting on April 11, 2006, the Board considered the Authority's 2007 Budget. Because of unfilled vacancies, the Board had fourteen voting members, ten of whom were in attendance.[12] The Board unanimously approved both the 2007 Bud-

---

**11.** The meeting was open to the public and Mr. Gewirtz was present. However, there is no indication in the record that he challenged the appointment of Mr. Gervais.

**12.** They were Jennifer Martin, Board President; Ron Griffin, Board Vice–President; Delano Bailey, Secretary; Beth Bullamore; Susanne Riveles; Emil Volcheck; Jeff Millard; Burnham; Gervais; and Friedman. Douglas Armstrong, a non-voting member, also attended.

get and, in a separate vote, a motion to retain the Supplemental Tax at the rate of twelve cents per $100 of assessed value.[13]

The Board of Estimates then considered the Authority's 2007 Budget at a public hearing held on May 17, 2006. At that hearing, Floyd voiced her opposition to the 2007 Budget, claiming that neither the 2007 Budget nor the Supplemental Tax had been properly approved by the Board on April 11, 2006. At the conclusion of the hearing, the Board of Estimates approved the 2007 Budget, including the Surtax.

Thereafter, on June 5, 2006, the plaintiffs filed the underlying suit. They challenged the qualifications of three of the ten individuals the Board had counted towards its quorum at the meeting on April 11, 2006. The plaintiffs insisted that neither Mr. Friedman nor Mr. Burnham met the voting eligibility requirements under Code, § 6–15(b), because neither owned property within the District. Further, they alleged that the Board had improperly included Mr. Gervais in its quorum, because his appointment as an at-large voting member on December 13, 2005, exceeded the Board's statutory authority. Because of "the ineligibility of Friedman and/or Burnham," the plaintiffs asserted that "there were insufficient eligible voting members present at the December 13, 2005 meeting to constitute a quorum capable of appointing Michael Gervais to the Authority Board...." Thus, the plaintiffs maintained that the Board had conducted business without a quorum, because only seven eligible voting members were present.

According to the plaintiffs, the Board's approval of the 2007 Budget, without a proper quorum, was "unlawful, null and void." Therefore, they claimed that "any subsequent presentation of a proposed Supplemental Tax to the Board of Estimates on or about April 28, 2006 was also unlawful and a nullity...." Thus, the plaintiffs asked the circuit court to declare the Surtax invalid, and to enjoin the City and the Authority from "imposing, collecting, and enforcing" the Surtax "for fiscal year 2007."

---

**13.** Mr. Gewirtz was present and did not challenge the votes.

The City filed a "Response to Request for Preliminary Injunction" on June 28, 2006, asking the court to deny the plaintiffs' request for a preliminary injunction. It contended, inter alia, that the action was moot, and that "[t]he only Plaintiffs in this case are those pro se Plaintiffs who have signed the Complaint and other papers: Joan L. Floyd, Stephen J. Gewirtz and Pamela J. Wilson."

On June 21, 2006, the Board held a special public meeting to reconsider its approval of the 2007 Budget. At the time, there were fourteen voting members on the Board, thirteen of whom participated in the meeting.[14] Of those thirteen, two participated by telephone.[15] By a vote of twelve to zero, with Mr. Gervais abstaining, the Board approved a Resolution that stated, in part:

1. That the Board hereby approves the Authority's budget and the surtax rate for the Charles Village Community Benefits District for the fiscal year ending June 30, 2007, that were approved by the Board of Estimates of the City of Baltimore on or about May 17, 2006;

2. That the Board hereby ratifies and approves the actions of the Board taken at the December 13 meeting, including but not limited to the appointment of Michael Gervais to membership on the Board as a voting member, representing Quad 4;

3. That the Board hereby ratifies and approves the actions of the Board taken at the April 11 meeting, including but not limited to the Board's approval of the proposed budget for the Authority for the fiscal year ending June 30, 2007, and the Board's vote to keep the surtax rate of 12 cents per $100 of assessed value unchanged for the fiscal year ending June 30, 2007; and

---

**14.** The participants were Martin, Griffin, Bailey, Burnham, Bullamore; Millard; Friedman; Gervais; Susanne Riveles; Myron Seay; Erika McClammy; Volcheck; and Denise Abrams.

**15.** McClammy and Riveles participated by conference telephone, pursuant to § 2.10(E) of the Bylaws. It states that participation by conference call "constitutes presence in person at a meeting."

4. That these resolutions have retroactive effect to the fullest extent necessary and allowed by law.

The court (Matricciani, J.) held an evidentiary hearing on the merits on July 18, 2006.[16] Numerous documentary exhibits were presented, and the court heard testimony from Jennifer Martin, Board President; Sandra Sparks, initial Administrator of the Authority; and Richard Burnham, Board Treasurer.[17]

Pursuant to Md.Code (1957, 2002 Repl. Vol), § 3–403 of the Courts and Judicial Proceedings Article ("C.J."), the court signed a Declaratory Judgment on July 26, 2006, (entered August 21, 2006), and issued a Memorandum Opinion.[18] Notably, the court found that nine Board members constituted a quorum. Further, it found that Burnham and Friedman were eligible voting members of the Board on April 11, 2006, when the Board approved the 2007 Budget. The court also found that Gervais was "duly elected to the Board of the Authority

---

16. On June 19, 2006, the plaintiffs had filed a "Motion for Hearing Prior to July 1, 2006 on Count I: Preliminary Injunctive Relief." After a motion hearing held on June 29, 2006, the court denied the request for preliminary injunctive relief by Order signed the same day (entered July 5, 2006). The court further stated: "The Complaint is signed by plaintiffs, Joan L. Floyd, Stephen J. Gewirtz and Pamela Wilson. Fourteen others are named as plaintiffs in the case caption at paragraphs 1–14. They have filed affidavits verifying the Complaint and the Court will deem them to be in compliance with Md. Rule 1–311(a). The original signers will be designated as lead plaintiffs."

17. We have already referred to some of the evidence adduced at the trial. Because the arguments presented here are largely legal, we need not detail the testimony presented below. Instead, we shall refer to the court's opinion, which summarized the evidence.

18. The court correctly observed: "To say that the issues involved in this matter are contested by the parties would be a gross understatement." The court also recognized that

the lead plaintiffs, although unrepresented in this case, have devoted a great deal of time and effort to researching the details of the establishment of the Charles Village Community Benefits District, its governing documents and all of its proceedings dating from the 1994 referendum, in which the voting members of the district approved its adoption.

We echo the circuit court's sentiments.

on December 13, 2005 to fill [the] vacancy occasioned by the departure of the recently elected Quad 4 Board representative, Tammy Mayer." In the court's view, Gervais was "entitled to serve on the Board until its next annual meeting or such earlier or later time as his successor is elected and qualifies."

Based on its conclusions, the court dismissed the Complaint, with prejudice. The Judgment stated, in part:

4. Pursuant to the Baltimore City Charter, Art. II, § (63), the Baltimore City Code, Art. 14, subtitle 6 and the current by-laws [sic] of the Charles Village Benefits District and Management Authority § 2.12, the actual presence of at least nine voting members shall constitute a quorum for all regular and special meetings of the Board of Directors.

5. There being a quorum present and voting at the Authority's Board meeting of April 11, 2006, the Board's actions in approving the FY 2007 budget, financial plan and supplemental tax for properties within the Charles Village Community Benefits District and submitting same to the City Board of Estimates for final approval was valid and effective. Plaintiffs' reliance on by-laws § 5.03B is unavailing. Even if the supplemental tax rate had to be approved by a majority of all the voting Board members, the Court interprets this by-law provision to mean a majority of all the voting Board members duly elected and/or appointed and eligible to vote at any given time. The record reflects that there were fourteen such voting members (including Eric Friedman) as of April 11, 2006. Disallowing Mr. Friedman's vote on April 11, 2006, there were still nine votes to approve the supplemental tax rate, clearly a majority of the fourteen voting members required by § 5.03B.

6. The action of the City Board of Estimates of May 17, 2006 in approving the FY 2007 budget and property surcharge rate for the Charles Village Community Benefits District was in accordance with the statutory scheme and valid and effective.

In its well reasoned Memorandum Opinion, the court reject-
ed plaintiffs' arguments that Bylaw 2.12, setting a quorum of
nine board members, "is invalid for both historical reasons and
as violative of Maryland common law." The court said, in
part:

> The cases cited to the Court by plaintiffs concern statutes,
> county council and city council enactments and other formal-
> ly enacted provisions which call for a majority of voting
> members to be present and voting in order for the respec-
> tive bodies to take significant actions, consistent with their
> enumerated authority. None of the cited cases, nor the
> provision in the Authority's by-laws [sic] which adopts Rob-
> ert's Rules of Order for the conduct of the Board's meet-
> ings, compel the result that plaintiffs desire. In the judg-
> ment of this Court, the enabling legislation, the Code and
> the by-laws of the Authority are consistent and the quorum
> provision contained in the by-laws was lawfully approved by
> the City Board of Estimates. The number of present and
> voting members required for the approval of the FY 2007
> budget, financial plan and supplemental tax is nine.

> Having determined that issue, the Court turns its atten-
> tion to the April 11, 2006 meeting of the Authority's Board
> of Directors, at which a proposed budget for FY 2007 was
> approved and a motion passed to submit same to the Board
> of Estimates for final approval. The meeting minutes of
> April 11, 2006 (defendants' Exhibit 5) indicates that there
> were ten voting and one non-voting members present. The
> motions to approve the FY 2007 proposed budget, to main-
> tain the same surtax rate of 12¢ per $100 of assessed value
> and to send the approved budget to the Board of Estimates
> for final approval were all sustained by unanimous votes.
> Among the voting members were the three individuals
> whose voting eligibility is challenged by plaintiffs, Richard
> Burnham, Eric Friedman and Michael Gervais. Thus, in
> order for an appropriate quorum to be present at this
> meeting, at least two of the three challenged Board mem-
> bers had to be eligible to vote.

As to Burnham's eligibility to serve as a voting member of the Board, the court said:

Richard Burnham testified that he had been a voting member of the Authority's Board for a period of five years and presently serves as its treasurer. His capacity to serve as a voting member of the Board arises from his representation of a constituent organization, The Old Goucher Business Alliance, Inc., which is allotted two voting members under Code, Art. 14, § 6–6(e)(4). Mr. Burnham further testified that he is the owner of a business, located within the District, known as Graphic Imaging, Inc., a sub-chapter S corporation of which he is the sole owner and president. Consequently, he personally pays the supplemental tax imposed on the property owned by Graphic Imaging, Inc.

Plaintiffs challenge Mr. Burnham's eligibility to serve as a voting member of the Board. They point to Code, Art. 14, § 6–6(e)(7) which requires that a voting member of the Board be eligible to vote in the election under § 6–15 of the Code. By its express terms, § 6–15 limits eligible voters to "owners of property within the District which is subject to tax under § 6–8; and voters registered to vote within the District." Code, Art. 14, § 6–15(b). Because Mr. Burnham is not technically either an owner of property within the District or registered to vote there, plaintiffs contend that he may not serve on the Board in a voting capacity.

In the judgment of the Court, plaintiffs' argument concerning Richard Burnham elevates form over substance.[ ] The very Code section to which plaintiffs point to disenfranchise Mr. Burnham, also indicates that "[A]t least a majority of the Board shall be composed of owners or representatives of property owners subject to the tax imposed by this subtitle." Further, the Code provides that "[T]he Board shall endeavor to maintain representatives on the Board from professionals practicing in the District, the retail merchants within the District, and the tenants of properties in the District; however, no minimum representation shall apply." Code, Art. 14, § 6–6(e)(8). In furtherance of this purpose, the by-laws, approved by the Board of Estimates,

contain a provision which says that "[A]t least a majority of the Board shall be composed of owners or representatives of property owners subject to the tax imposed by this subtitle. A voting member of the Board must be eligible to vote in the election under § 260 of the Ordinance. An owner of property which is utilized for commercial purposes may designate an individual to represent the owner if: (a) the individual is (1) a tenant of the owner, (2) a corporate officer or partner of the tenant of the owner, or (3) a business representative or agent of the owner, and (b) the owner authorizes and designates in writing an individual to represent the owner on the Board." The same provision goes on to set forth the goals set out in the Code provision maintaining representatives from professionals, retailers and tenants in the District. By-laws, § 202 B. Thus, while Richard Burnham is not technically an owner of property subject to tax within the District, he is the owner of a corporation, which may only act through persons such as himself and he is, by virtue of sub-chapter S status of the corporation, the actual individual who pays the supplemental tax on the property where Graphic Imaging, Inc. is located. His participation as a voting member of the Board is consistent with the provisions in all the governing documents calling for representatives of the professional and retail and tenant community to serve thereon. He is a duly appointed representative of the Old Goucher Business Alliance, Inc., which has a statutory entitlement to appoint two voting members to the Authority's Board. Considering all of the circumstances, the Court finds that Richard Burnham was an eligible voting member of the Board on April 11, 2006.

As to Friedman's eligibility to serve as a voting Board member, the court stated:

Plaintiffs do not dispute that Eric Friedman is the Mayor's current appointee to serve on the Authority's Board.[ ] Nor do they dispute that the Code, Art. 14, § 6–6(e)(1) authorizes the Mayor to appoint one voting member to the Board. Their contention with respect to Mr. Friedman is that he fails to meet the voting eligibility requirements of

§ 6–15 because he is neither an owner of property subject to the tax within the District nor a registered voter there. Defendants counter that the Board has never interpreted this provision to require the Mayor's representative, the only citywide voting representative on the Board, to comply with the technical requirements of § 6–15 and, alternatively, that the City owns property within the District, although it is exempt from the supplemental tax.

In the Court's judgment none of those facts is determinative. Plaintiffs' claim with respect to Mr. Friedman must fail for a want of evidence. Despite the fact that the Court admitted all of the documents proffered by the plaintiffs, including their own affidavits, at the adversary hearing on July 18, at the conclusion of these proceedings, the record is void of any evidence establishing that Eric Friedman either does not own property in the District subject to the tax or that he is not a registered voter in the District. It is the plaintiffs' burden to prove these facts and in the absence of such proof, the Court must find that Eric Friedman was an eligible voting member of the Authority Board on April 11, 2006.

The court found that because Mr. Burnham and Mr. Friedman were present and eligible to vote at the Board's April 11, 2006 meeting, the Board had "a lawful quorum present" when it approved the 2007 Budget. Therefore, it determined that "the Board's actions in approving a FY 2007 budget and supplemental tax were valid and properly presented to the Board of Estimates for approval." Thus, the court found it "unnecessary to determine whether the Authority's actions were ratified at the Board meeting on June 21, 2006 and whether that ratification moots plaintiffs' claims here."

In addition, the court found it unnecessary to "determine whether Board member Michael Gervais became an eligible voting member of the Board on December 13, 2005 ..." Nonetheless, the court said:

Plaintiffs' contentions with respect to Mr. Gervais do raise concerns with the Court because the evidence indicates that

in at least one previous vacancy situation in 2002 a different procedure was employed, involving a new nomination and special election to the Board. On the other hand, with the Court's findings today that a valid quorum was constituted by nine present voting members, and that Mr. Burnham and Mr. Friedman were eligible voting members, it does appear that Mr. Gervais' appointment was approved by the unanimous consent of the nine voting members present on that date.

Mr. Gervais' status, therefore, hinges on Authority by-law 2.09, which governs the filling of vacancies of Board members not appointed by elected officials or associations. The by-law appears to permit the actions taken on December 13, 2005. The fact that Ms. Mayer's term had not yet begun points up a difficulty with the existing by-law because it does not contemplate such a situation. Nonetheless, Michael Gervais was selected by a majority of the remaining directors to fill her vacancy and he is entitled to serve until the next annual meeting or a new Board member from Quad 4 is elected and qualified. The Authority would be well advised to reconsider this by-law provision in light of its inconsistent interpretation and limited scope.

(Internal citation omitted.)

Pursuant to Md. Rule 2–534, on July 28, 2006, plaintiffs filed a motion to alter or amend judgment. In their memorandum, plaintiffs claimed that the court failed to decide the "essential question" of the meaning of Bylaw 5.03(B) and its effect on the Board's vote to approve the 2007 Budget. They argued:

In its determination that "[t]he number of present and voting members required for the approval of the FY 2007 budget, financial plan and supplemental tax is nine" (or 9 out of 19), the Court has relied on Section 2.12, the Bylaws provision cited by the Defendants, but has *failed to address* **Section 5.03(B),** the Bylaws provision cited by the plaintiffs, **expressly requiring a majority of all voting members** (or 10 out of 19) **to affirmatively vote on the motion to adopt a Supplemental Tax rate. Section 5.03(B)** was approved by the Board of Estimates in 1995 as part of the original

Bylaws and cannot be disregarded, as it completed the statutory scheme for adoption of a Supplemental Tax rate on April 11, 2006. The Plaintiffs noted the significance of this provision at the first hearing before this Court, and extensively argued, with exhibits, the meaning and significance of **Section 5.03(b)** at the second hearing, yet the Court in its Judgment and Opinion fails to even acknowledge this relevant and *non-suspendable*[1] Bylaws provision.

Regardless of the Court's position that a lawful quorum under the Bylaws was 9, the Court should alter and amend its judgement to state that *in the case of the adoption of a Supplemental Tax rate,* the minimum number of voting members required under **Section 5.03(B)** of the bylaws was 10.

Plaintiffs also sought, *inter alia,* to present additional evidence to show that, on December 13, 2005, Friedman was "neither a registered voter within the District, nor an owner of property subject to the Supplemental Tax." They proffered his 2005 Financial Disclosure Statement, showing that he lived outside the District. Plaintiffs asserted:

As Eric Friedman was *not* an eligible voting member of the Authority Board on December 13, 2005, 9 eligible voting members were *not* present on that date to appoint Michael Gervais, and Michael Gervais was *not* an eligible voting member on April 11, 2006. Therefore, the Court should alter and amend its Judgment accordingly.

The court held a motion hearing on August 22, 2006, at which it received Friedman's Disclosure Statement. Thereafter, the court signed an Amended Declaratory Judgment (entered August 30, 2006), again holding that the Board properly approved the 2007 Budget. The court reiterated that Mr. Burnham was a voting member, and continued:

2. Although the Court admitted additional evidence at the post-trial motions hearing on the issue of Eric Friedman's qualifications as a voting member of the Authority's Board, the Court does not believe that plaintiffs have met their burden of proof by the introduction of admissible evidence

to establish that Eric Friedman was neither an owner of property subject to the supplemental tax in the Benefits District nor a registered voter there. On the other hand, defendant cannot honestly contend that Mr. Friedman meets the voting member eligibility requirements of the Baltimore City Code, Art. 14, § 6–15(b). Nor is there any express provision in the Baltimore City Code, exempting the Mayor's appointed representative from those voting eligibility requirements. Thus, a reasonable interpretation of the Code provisions would be that the Mayor is entitled to appoint a voting member of the Authority's Board, so long as he chooses someone who otherwise meets the voting eligibility requirements of § 6–15(b). For the purpose of this amended Declaratory judgment, therefore, the Court will not predicate its decision upon Eric Friedman's eligibility to serve as a voting member of the Authority's Board.

3. In accordance with the by-laws ... Michael Gervais was duly elected to the Board of the Authority on December 13, 2005 to fill a vacancy occasioned by the departure of the recently elected Quad 4 Board representative, Tammy Mayer. He is entitled to serve on the Board until its next annual meeting or such earlier or later time as his successor is elected and qualifies. Giving full consideration to the concerns expressed in the Court's Memorandum Opinion of July 26, 2006, the Court nevertheless finds that Michael Gervais was a valid, voting member of the Authority's Board when it approved the FY 2007 budget, financial plan and supplemental tax on April 11, 2006.

4. Pursuant to the Baltimore City Charter, Art. II, § (63), the Baltimore City Code, Art. 14, subtitle 6 and the current by-laws of the Charles Village Community Benefits District and Management Authority, § 2.12, the actual presence of at least nine voting members shall constitute a quorum for all regular and special meetings of the Board of Directors.

5. There being a quorum present and voting at the Authority's Board meeting of April 11, 2006, the Board's actions in approving the FY 2007 budget, financial plan and supplemental tax for properties within the Charles Village

Community Benefits District and submitting same to the City Board of Estimates for final approval was valid and effective.

6. The action of the City Board of Estimates of May 17, 2006 in approving the FY 2007 budget and property surcharge rate for the Charles Village Community Benefits District was in accordance with the statutory scheme and valid and effective.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Preliminarily, we shall address two threshold matters. One concerns the City's contentions that Floyd, Gewirtz, and Wilson were the only proper plaintiffs, and that Floyd is the only viable appellant. The other pertains to Floyd's claim that the City's cross-appeal is invalid because it was filed in violation of Article VII, § 26 of the Baltimore City Charter.

### A.

In its cross-appeal, the City observes that "the present action was filed by Joan L. Floyd, Stephen J. Gewirtz and Pamela Wilson, none of whom is an attorney, on their own behalf and purportedly on behalf of fourteen others." [19] Floyd, Gewirtz, and Wilson were the only plaintiffs who actually signed the Complaint and attended the court hearings. The remaining plaintiffs signed affidavits that were filed during or after the motion hearing on June 29, 2006. Each affiant represented that he or she owned property in the District, was a plaintiff in the action, and affirmed that the contents of the Complaint were true to the best of the affiant's knowledge, information and belief. However, they did not sign and file an amended suit.

---

**19.** The other named plaintiffs are set forth in note 2, *supra*.

The notice of appeal and the addendum to it were signed only by Ms. Floyd, *pro se.* She also signed the brief "on behalf of the Appellants,"[20] designating herself as "Lead Appellant."

Because Maryland Rule 1–311 requires "a party who is not represented by an attorney" to sign "[e]very pleading and paper," the City contends that the circuit court "should have excluded" the fourteen plaintiffs "who failed to comply with Rule 1–311...." For the same reasons, it argues that this Court should "dismiss the appeal as to all appellants except Ms. Floyd." The City asserts:

> The City raised the issue of non-compliance with Rule 1–311(a) several times and asked that the lower court strike the improper pleadings as to the non-signing parties.... In its order dated June 29, 2006, the lower court deemed that the plaintiffs were in compliance with Rule 1–311(a) and designated Ms. Floyd, Mr. Gewirtz and Ms. Wilson as "lead plaintiffs."

> The parties other than Ms. Floyd, Mr. Gewirtz and Ms. Wilson did not sign the pleadings. In effect, Ms. Floyd, Mr. Gewirtz and Ms. Wilson were placed in the position of acting as attorneys for the other fourteen plaintiffs. The lower court should have stricken the complaint as to the non-signing parties and allowed the case to proceed only as to Ms. Floyd, Mr. Gewirtz and Ms. Wilson, who complied with the rule and actually participated in the case. Their challenge could have proceeded on its merits without any violation of the rule.

> A similar situation exists in the present appeal. The only person to sign the notice of appeal, the addendum to the notice of appeal and the Appellants' Brief is Ms. Floyd.... Pursuant to Rule 1–31 l(a), Ms. Floyd should be the only appellant and the Court should dismiss the appeal as to all other purported appellants.

---

**20.** All of the would-be plaintiffs did not pursue an appeal. *See* note 3, *supra,* for the names of the putative appellants.

According to the City, the circuit court "abused its discretion by allowing non-attorneys to represent other non-attorneys, filing papers on their behalf and making tactical decisions on their behalf at the injunction hearing, at trial and during post-trial proceedings." It posits: "These decisions bound the absent plaintiffs as if those persons had been represented by counsel. Similarly, if Ms. Floyd represents the purported appellants, she is acting as their attorney and making decisions for them in this appeal." Rule 1–311(a), the City asserts, "is meant to ensure that *pro se* parties will not be represented by non-attorneys but are rather in charge of their own cases."

Citing Rule 8–602(a), which states that "the Court may dismiss an appeal" that "is not allowed by these rules or other law," or that "was not properly taken pursuant to Rule 8–201," the City argues: "Like any other paper, a notice of appeal by a *pro se* appellant must be signed by that appellant. Rule 1–311(a). A notice of appeal that is not properly signed is not properly filed and is not allowed by the rules. Therefore, dismissal is the appropriate remedy."

Appellant responds that "Maryland Rule 8–602 does not call for dismissal of the Appeal as to all but one of the Appellants." Asserting that "if a mistake has been made by the lead Appellant, the others need not be penalized," Floyd argues:

As to the City's contention that there were Plaintiffs below who failed to comply with Maryland Rule 1–311(a), the Appellants believe it was within the lower court's discretion to deem all Plaintiffs as being "in compliance with Md. Rule 1–311(a)" ... and to proceed with the three original signers as "lead plaintiffs." Each of the other fourteen Plaintiffs verified the Complaint by affidavit. . . .

Maryland Rule 1–311(a) states:

Every pleading and paper of a party represented by an attorney shall be signed by at least one attorney who has been admitted to practice law in this State and who complies with Rule 1–312. *Every pleading and paper of a party who is not represented by an attorney shall be signed*

*by the party.* Every pleading or paper filed shall contain the address and telephone number of the person by whom it is signed. It also may contain that person's business electronic mail address and business facsimile number. (Emphasis added.)

Rule 1–311(c) is also relevant. It provides that, "if a pleading or paper is not signed as required . . . or is signed with intent to defeat the purpose of this Rule, it may be stricken and the action may proceed as though the pleading had not been filed."

Sections 10–206 and 10–601 of the Business Occupations and Professions Article ("B.O.P.") of the Maryland Code (1989, 2004 Repl.Vol., 2007 Supp.) are also pertinent. B.O.P. § 10–206(a) provides, in part:

### § 10–206. Admission required; exceptions.

(a) *In general.*—Except as otherwise provided by law, before an individual may practice law in the State, the individual shall:

(1) be admitted to the Bar; and

(2) meet any requirement that the Court of Appeals may set by rule.

B.O.P. § 10–601(a) states, in pertinent part:

### § 10–601. Practicing without admission to Bar.

(a) *In general.*—Except as otherwise provided by law, a person may not practice, attempt to practice, or offer to practice law in the State unless admitted to the Bar.

In *Turkey Point Property Owners' Association, Inc. v. Anderson,* 106 Md.App. 710, 666 A.2d 904, (1995), a Maryland corporation, the Turkey Point Property Owners' Association (the "Association"), had filed a petition for judicial review of a zoning board decision. *Id.* at 712, 666 A.2d 904. The Association "was represented by counsel in the administrative proceedings that preceded the filing of the petition for judicial review in the trial court. The petition for review, however, was signed by the Association's president, Brenda DeLalla," *id.* at 713, 666 A.2d 904, who was a lay person, not admitted to

practice law. *Id.* at 719, 666 A.2d 904. Nevertheless, she filed the petition and represented the Association in the circuit court. *Id.* at 715, 666 A.2d 904.

The circuit court affirmed the zoning board's decision, and the Association appealed. The appellees filed a cross appeal, urging us not to consider the arguments of the Association because it was "not represented in the trial court by an attorney admitted to practice law in Maryland[.]" *Id.* at 712–13, 666 A.2d 904. We agreed, and vacated the judgment of the trial court because the Association "was not represented in the trial court by an attorney admitted to practice law in Maryland[.]" *Id.* at 713, 666 A.2d 904. In doing so, we cited B.O.P. §§ 10–206, and 10–601, and traced the history of Maryland's prohibition against the unauthorized practice of law back to 1831. *Id.* at 715–16, 666 A.2d 904. The Court observed that the purpose of the prohibition " 'is to protect the public from being preyed upon by those not competent to practice law-from incompetent, unethical, or irresponsible representation.' " *Id.* at 717, 666 A.2d 904 (quoting *In re Application of R.G.S.*, 312 Md. 626, 638, 541 A.2d 977 (1988)). The Court added:

> As a general rule in other jurisdictions,
>
> "[p]roceedings in a suit by a person not entitled to practice are a nullity, and if appropriate steps are timely taken the suit may be dismissed.... If the cause has proceeded to judgment, the judgment is void and will be reversed. Furthermore, the acts or steps of the unauthorized practitioner will be disregarded, and the papers and documents which he drafted should be stricken."

*Id.* at 718, 666 A.2d 904 (quoting 7 C.J.S. Attorney & Client § 31 at 869 (1980) (footnotes omitted)) (additional citations omitted).

Consequently, we held that the petition for judicial review prepared and submitted by Ms. DeLalla—a nonlawyer—"was a nullity, as were the proceedings before the trial court." *Id.* at 720, 666 A.2d 904. This "drastic remedy" was called for by "[t]he totality of the circumstances, including the long history

of rules and legislation aimed at preventing the practice of law by nonlawyers[.]" *Id.* at 719–20, 666 A.2d 904.

Based on the principles discussed above, we agree with the City that Ms. Floyd is the only proper appellant. Because Floyd is not an attorney, she cannot represent other individuals in a legal capacity, nor otherwise act on their behalf in regard to the appeal. The failure of the *pro se* individuals listed as appellants to sign the notice of appeal disqualifies them as appellants.[21] Therefore, we shall dismiss the appeal as to all persons other than Ms. Floyd.

In reaching this decision, we are relieved of the need to consider the City's claim that the circuit court erred in failing to dismiss as plaintiffs the eleven persons who did not personally sign the Complaint. As a result, we need not determine whether the circuit court correctly concluded that, when these eleven individuals signed the affidavits, they satisfied Rule 1–311.

## B.

Floyd observes that the City's Notice of Cross–Appeal was signed by William R. Phelan, Jr., "Principal Counsel, Baltimore City Department of Law," as "Attorney for Mayor and City Council of Baltimore." Relying on Article VII, § 26 of the Baltimore City Charter, Floyd contends that Phelan lacked the authority to file the cross appeal.

We pause to review the City Charter, which states in Article VII, § 26:

### § 26. Department of Law: suits; appeals.

The City Solicitor shall have authority to institute, defend or discontinue on behalf of the City, any suit, action, or proceeding in any local, State or federal court or tribunal, but no appeals on behalf of the City to the Court of Appeals, the Supreme Court of the United States, or the United States Court of Appeals shall be taken except upon the written

---

**21.** These individuals are Gewirtz, Kellum, Bush, Gustafson, Hildreth, Whiting, and Shettle.

order of the City Solicitor, or outside counsel employed pursuant to Section 24(c), approved by the Mayor.

According to Floyd, Phelan was neither "outside counsel" nor the City Solicitor, "and thus lacked the authority to file a cross-appeal on behalf of the City." While recognizing that § 26 of the City Charter does not refer to this Court, Floyd argues that the provision

was in effect in 1964 and thus predated the establishment of this intermediate appellate court. There is nothing to suggest that the establishment of this intermediate appellate court, and the re-assignment of appeals to the same, negated the pre-existing City Charter requirement for proper authorization of appellate action.

The City responds that because § 26 of the City Charter does not refer to this Court, it is inapplicable. In its view, appellant's argument

does not account for the facts that a revised Charter was adopted by the voters of Baltimore in 1996 and that the new version of the Charter included the appeal approval provision without any mention of this Court, even though the Court was in existence long before the revised Charter was adopted.

Based on the plain text of the Charter, we readily agree with the City that the requirements cited by Floyd do not apply to the filing of a cross-appeal by the City in this Court. Therefore, Floyd's contention is without merit.

## II.

We next examine a preliminary contention raised by both appellees: they urge us to dismiss the appeal as moot. In the City's view, "the Plaintiffs failed to present a justiciable controversy, because of the curative acts of the Authority's Board,[1]" when it passed the Resolution of June 21, 2006, ratifying the 2007 Budget and approving the appointment of Mr. Gervais. Explaining that ratification is "[c]onfirmation and acceptance of a previous act, thereby making the act valid from the moment it was done," the City contends that the

challenge to the Board's approval of the 2007 Budget on April 11, 2006, is now moot, because the subsequent "ratification made the previous budget and tax rate 'valid from the moment' they were originally done." [22]

Appellees also contend that the Board had a quorum when the ratification occurred. They note that eleven members were physically present and two other members participated through telephone conference call, as permitted by the By-laws. "Because there were ten unchallenged voting members present at the June 21, 2006 meeting," they maintain that "there is no need to argue here the issue of whether the quorum is nine or ten."

---

**22.** The Authority adopted and incorporated by reference "the portions of the brief of the City that support the argument" that appellant's claims are moot. Although the Authority agrees that the appeal is moot, based on the Board's ratification, it disputes that the matter is not justiciable. In its view, "the trial court still had jurisdiction to adjudicate the plaintiffs' Declaratory Judgment action, and ... it was within its discretion in doing so."

It is well settled that " 'the existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action.' " *Boyds Civic Ass'n v. Montgomery County Council,* 309 Md. 683, 689, 526 A.2d 598 (1987) (citation omitted). A controversy is justiciable if it is "live," *i.e.,* it is one in which " 'there are interested parties asserting adverse claims *upon a state of facts which must have accrued* wherein a legal decision is sought or demanded.' " *Id.* (Citation omitted) (emphasis added by *Boyds* ). In contrast, "[a] case is moot when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective remedy." *Coburn v. Coburn,* 342 Md. 244, 250, 674 A.2d 951 (1996); *see Hill v. Scartascini,* 134 Md.App. 1, 4, 758 A.2d 1087 (2000).

To be sure, " 'appeals which present nothing else for decision are [generally] dismissed as a matter of course.' " *Albert S. v. Department of Health and Mental Hygiene,* 166 Md.App. 726, 743, 891 A.2d 402 (2006) (quoting *In re Riddlemoser,* 317 Md. 496, 502, 564 A.2d 812 (1989)). This is because any decision as to such an issue "would amount to an academic undertaking; appellate courts 'do not sit to give opinions on abstract propositions or moot questions.' " *Id.* at 743–44, 891 A.2d 402 (citation omitted). *See generally Board of Physician Quality Assurance v. Levitsky,* 353 Md. 188, 200, 725 A.2d 1027 (1999); *Atty. Gen. v. Anne Arundel Co. Sch. Bus Contractors Ass'n,* 286 Md. 324, 327, 407 A.2d 749 (1979); *Committee for Responsible Development on 25th Street v. Mayor of Baltimore,* 137 Md.App. 60, 69, 767 A.2d 906 (2001).

Further, appellees argue that the Board of Estimates did not have to take any additional action to approve the 2007 Budget after the Board's ratification. They state: "What the Board of Estimates approved on May 17, 2006 was the same budget and the same tax rate that were originally approved by the Authority and that were later ratified."

Floyd disputes the claim that the ratification was proper, so as to render the issue moot. She argues that the Board did not have a quorum present at its meeting on June 21, 2006, when the resolution was passed, because only seven of the twelve members who approved the Resolution were eligible to do so. In this regard, she insists that Mr. Burnham and Mr. Friedman were ineligible, reducing the number of voters to ten. Of these ten, asserts Floyd, Denise Abrams could not be counted in the quorum because she arrived after the Board had called the meeting to order.

Appellant also argues that no statute permits Board members to participate through telephone conference, and thus the two Board members who were not "physically present" could not vote on ratification. Conceding that Md.Code (2002 Repl. Vol.), § 2–409(d) of the Corporations and Associations Article ("C.A.") empowers some boards of directors to participate by telephone, Floyd nonetheless argues that this authorization does not apply to the Board. She explains: "The Authority's Board, a governmental body, is a creature of the General Assembly.... The General Assembly has never provided the Authority with the power to meet by conference telephone. The Authority's own By-laws [sic], even if approved by the Board of Estimates, cannot convey this power to the Authority."

In addition, appellant contends that, even if the Board had the power to ratify its actions, it was required to follow the same procedures required to take the actions in the first place. According to appellant, the Code requires the Board to "submit all materials [to the Board of Estimates] at least 2 months prior to the proposed effective date of a budget or Supplemen-

tal tax," yet the Board failed to submit the ratified 2007 Budget before the effective date of May 1, 2006.

Citing Bylaw 5.03, appellant also argues that the Board failed to take the "required separate votes" of the Surtax rate and the 2007 Budget. Instead, argues Floyd, there was "only a blanket 'resolution,' combining several prior actions, that was [sic] offered, considered and purportedly adopted [on] June 21, 2006 by a single vote." Appellant maintains that the Board of Estimates has final approval over the Supplemental Tax, and the Authority cannot impose such a tax above what the Board of Estimates approves. Even if the Board could ratify its prior action, argues appellant, it had no authority to ratify the Board of Estimates' approval of that prior act. Consequently, she insists that the 2007 Budget is null and void.

The circuit court concluded in the Amended Judgment that the plaintiffs presented "a justiciable controversy." However, based on its analysis of the quorum issue and the Board qualification claims, the court found it unnecessary to reach the question of whether, on June 21, 2006, the Board properly ratified its earlier actions, "and whether that ratification moots plaintiff's claims. . . ." Moreover, in the court's view, the case involved "matters of public concern." Therefore, it proceeded to "declare the rights and status of the parties." We agree with the circuit court's approach.

The case before us involves challenges to the propriety of the actions of a community benefits district authority that has the power to propose tax-and-spend plans in order to provide services to the District. To resolve the dispute as to the legality and effectiveness of the ratification, as a necessary predicate to disposing of the mootness issue, we would have to address many of the same issues pertinent to appellant's challenge to the initial Board action approving the 2007 Budget. These include issues as to the qualifications of certain Board members and what constitutes a quorum of the Board. We would also have to consider additional issues not pertinent to appellant's challenge to the initial Board action, such as

whether the ratification was effective despite the fact that the Board of Estimates did not approve the 2007 Budget for a second time, following the purported ratification.

■ Even if we first addressed the issue of ratification, and concluded that the ratification was proper and rendered the case moot, we would exercise our discretion to consider appellant's challenge to the initial Board approval of the 2007 Budget. This is because the issues raised by the parties involve matters of important public concern.

The doctrine of mootness is not without exceptions. As the Court recognized in *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 125, 775 A.2d 1249 (2001), an appellate court "will, on rare occasions, address the merits of a moot case when [it is] 'convinced that the case presents unresolved issues in matters of important public concern that, if decided, will establish a rule for future conduct.' " (quoting *Coburn v. Coburn*, 342 Md. 244, 250, 674 A.2d 951 (1996)). *See In Re Justin D.*, 357 Md. 431, 444–45, 745 A.2d 408 (2000); *State v. Parker*, 334 Md. 576, 584, 640 A.2d 1104 (1994); *Bond v. Slavin*, 157 Md.App. 340, 354, 851 A.2d 598 (2004). *See also Suter v. Stuckey*, 402 Md. 211, 220, 935 A.2d 731 (2007); *J.L. Matthews, Inc. v. Maryland–National Capital Park and Planning Comm'n*, 368 Md. 71, 96, 792 A.2d 288 (2002); *Lloyd v. Bd. of Supervisors of Elections*, 206 Md. 36, 43, 111 A.2d 379 (1954); *Beeman v. Department of Health & Mental Hygiene*, 105 Md.App. 147, 158, 658 A.2d 1172 (1995).

Accordingly, we deem it appropriate to begin with an analysis of appellant's challenges to the Board's initial approval of the 2007 Budget.[23]

### III.

Appellant challenges the Board's approval of the Surtax. Thus, she maintains "that the Board of Estimates did not

---

**23.** Our disposition of the challenges presented to the Board's initial approval of the Surtax make it unnecessary for us to resolve the ratification issue.

lawfully approve a Supplemental Tax on their properties for FY 2007, as it did not have before it a lawfully adopted Supplemental Tax proposal from the Authority's Board."

Noting that the Board cannot conduct business in the absence of a quorum, Floyd maintains that a quorum here necessarily consists of at least ten voting members of the Board, and thus the Board acted without a quorum. Conceding that Bylaw 2.12 provides for a quorum of nine members, Floyd insists that this provision is not controlling because the Authority "is a governmental entity, created by statute for the purpose of imposing, collecting and spending a Supplemental Tax," and, "under the Corporations and Associations Article," the Board is not "permitted to conduct business with less than a majority...." Given that there are nineteen authorized voting member positions, Floyd argues that the quorum must be ten, even if, because of unfilled vacancies, there are actually fewer than nineteen existing voting members on the Board. She asserts: "An act of less than a quorum of Board members is nothing but the act of individuals, and is void."

According to appellant, the provision in the Bylaws for a quorum of nine was the result of an "oversight," because the Bylaws "were never intended to designate a quorum of less than a majority...." She continues:

As pointed out to the court below during oral argument an examination of the initial By-laws [sic] indicates that the underlined word *'voting'* was inserted into the text of subsection 2.03(i) to describe the Mayor's appointee as a voting member which would have had the effect of increasing the total voting membership from seventeen to eighteen, in conformity with the City Code. Simple neglect or failure to make the corresponding amendment to the quorum number, to increase it from nine (a majority of seventeen) to ten, would easily explain how the original eighteen-member body may have unintentionally appeared to be authorised to conduct business with less than a majority. Such a mistake might easily have been made, and overlooked, but cannot be used today to abrogate the common-law principle that a

quorum of a deliberative governmental body is at least a majority.

\* \* \*

[T]he quorum for the Authority's Board was a fixed number; in order to provide a majority, the fixed number had to be no less than ten. It was error for the lower court to rule otherwise.

Appellees rely on Bylaw 2.12, which clearly provides for a quorum of nine.[24] They dispute appellant's claim that the quorum of nine was established by "oversight," noting that the City approved Bylaw 2.12, and the Board has been employing a nine-member quorum since 1995.

The Authority adds that the Board, as a "public body," is subject to Maryland's Open Meetings Act, codified at Md.Code (2004 Repl.Vol.), § 10–502(k) of the State Government Article ("S.G."). It notes that S.G. § 10–502(k)(2) defines a quorum as a majority of the members of a public body, or "any different number that law requires." It also points to Bylaw 7.06, which obligates the Board to conduct meetings in accordance with the Enabling Law, the Ordinance, and the Bylaws, as supplemented, and, where not inconsistent, by Robert's Rules of Order, Newly Revised ("Roberts"). According to the Authority, Roberts

> flatly refutes the plaintiffs' argument that a quorum must be at least a majority. In describing quorum requirements for boards, [Roberts] provides that the quorum is a majority of the members of the board "unless a different quorum is fixed … by the bylaws[.]" Plainly, a quorum of less than a majority is entirely lawful. It is also sensible on a voluntary board such as the [Authority's] Board. As [Roberts] observes, a majority quorum may be appropriate in legislative bodies, such as the Congress, "but too large in most voluntary societies." (Citations omitted.)

---

24. The City "adopts the Authority's arguments for affirmance." Because the arguments of the appellees overlap, we will present them collectively as the contentions of both appellees, unless otherwise noted.

In her reply, Floyd insists that "there is nothing to *empow-er* the Authority's Board to fix the quorum at less than a majority," i.e., ten persons. She claims that, absent a statute fixing a quorum, "a majority of any body consisting of a definite number, is necessary to constitute a quorum." Acknowledging that C.A. § 2–408(b) authorizes some Maryland corporations to set quorums of less than a majority, appellant maintains that this provision does not apply to the Authority, a "governmental body both politic and corporate," and "a creature of the General Assembly," because the Legislature "has never granted the Authority the power to lawfully meet and conduct business with less than a majority of the full voting Board." She also claims that "[t]he Open Meetings Act may not be construed to authorize public bodies to convene less than a majority to transact their business." Even if the Board of Estimates approved Bylaw 2.12, Floyd insists that it "cannot abrogate higher law" and permit the Board to "meet and conduct public business with less than a majority."

In its reply brief, the City impugns appellant's underlying position that the Board "is a definite body composed of 19 members . . . .", and disputes appellant's position that a quorum consists of ten, i.e., a majority of the nineteen authorized voting members of the Board. The City points out that the Ordinance requires at least nineteen voting members, "except during periods of temporary vacancies." Because of such vacancies, notes the City, the size of the voting membership is not definite or fixed at nineteen. It suggests that the quorum of nine "ensures that there will be a substantial representation of the Board needed for a quorum." It explains:

Because the size of the voting membership is not fixed, but is rather the number of voting members sitting at a particular time, the Appellant's position that the quorum must be a majority of the voting members leads to the conclusion that the quorum can be less than ten. Of course, using the "majority of the sitting voting members" formula to determine the quorum would lead to very small quorums at times. The bylaws, approved by the Board of estimates, wisely set the quorum at nine. Bylaws § 2.12. This allows

the Board to function in time of temporary vacancies but guaranties that there will be a substantial number of voting members participating in the Board's decisions.

The City reiterates that the Board "may adopt any bylaw that is not inconsistent with the ordinance or ... Art II, § 63 of the Charter." It also claims that C.A. § 2–408(b) empowered the Authority, as a corporate body, to set a quorum of less than a majority. Moreover, the City maintains that Bylaw 2.12 is consistent with the Open Meetings Act.

We are readily persuaded that the circuit court properly found that a quorum of the Board consists of nine members. We explain.

In *Chisholm v. Hyattstown Volunteer Fire Dept., Inc.,* 115 Md.App. 58, 691 A.2d 776 (1997), we said, " '[b]y-laws are construed under principles governing the construction of ... contracts, primarily to effectuate the parties' intent.' " *Id.* at 71, 691 A.2d 776 (quoting *American Fed'n of Teachers v. Lubman,* 50 Md.App. 13, 19, 435 A.2d 801 (1981) (citations omitted)). Where the language of a contract is not ambiguous, a court generally will not look to parol or extrinsic evidence to vary its meaning. *Higgins v. Barnes,* 310 Md. 532, 537, 530 A.2d 724 (1987); *Maslow v. Vanguri,* 168 Md. App. 298, 317, 896 A.2d 408 (2006). Bylaw 2.12 clearly provides that "[t]he actual presence of at least 9 voting members shall constitute a quorum for all regular and special meetings of the Board of Directors." Because there is no ambiguity in Bylaw 2.12, we reject appellant's contention that it fixed a quorum of nine members as the result of an "oversight."

We also disagree with appellant's claim that there was no statutory authority authorizing the Authority to adopt Bylaw 2.12. There are, in fact, several independent sources of this authority.

First, the Ordinance creating the Authority granted it the power, "subject to approval of the Board of Estimates," to "adopt, amend, and modify bylaws, consistent with the Enabling Legislation and this subtitle." Code, Art. 14, § 6–4(13). The Ordinance did not withhold from the Board the power to

pass a bylaw setting a quorum of less than a majority, and Bylaw 2.12 is not in conflict with any provisions of the Enabling Law or the Ordinance. Second, the Authority's power to enact Bylaw 2.12 derives from C.A. § 2–408(b), which authorizes Maryland corporations to set quorums of less than a majority, and C.A. § 1–102, which provides that the Article applies to every Maryland corporation, except as otherwise provided by statute. In this regard, the Ordinance clearly states that, to the extent allowed under law, the Authority is a body corporate.

Appellant suggests that C.A. § 2–408(b) does not apply to the Board because it is a "governmental body." But, she cites no relevant authority to support her claim. The only case cited by appellant, *Heiskell v. Mayor, Etc., of Baltimore,* 65 Md. 125, 4 A. 116 (1886), examined whether the Baltimore City Council, the council for a municipal corporation, could set the number of its members necessary to constitute a quorum. Unlike the City of Baltimore, however, the Authority is not a municipal corporation, as is evident from Md.Code (1957, 2005 Repl.Vol.), Article 23A, which regulates municipal corporations. It provides, in part:

§ 9. **Definitions and limitations.**

(a) *"Municipal corporation" defined; construction of article and certain local laws.*—As used in this subtitle the term "municipal corporation" shall include all cities, towns and villages, now or hereafter created under any general or special law of this State for general governmental purposes, which are subject to the provisions of Article XI–E of the Maryland Constitution, which possess legislative, administrative and police powers for the general exercise of municipal functions, and which carry on such functions through a set of elected and other officials. *The term is not to include any special tax area or district,* sanitary district, park or planning district, soil conservation district or other public agency *exercising specific powers within a defined area but which does not exercise general municipal functions* and the term is not to include the Mayor and City Council of Baltimore. (emphasis added)

The Court of Appeals examined "the legal theory underlying the forty-two special community benefit districts in Anne Arundel County" in *Williams v. Anne Arundel County*, 334 Md. 109, 638 A.2d 74 (1994). Concluding that such districts "are special benefit assessment areas[,]" the Court observed: " 'The use of such "special assessments" has a long history in the United States.' O. Reynolds, Jr., Local Government Law § 99, at 300 (1982) (footnote omitted)." *Id.* at 117, 638 A.2d 74. The Court continued, *id.* at 118, 638 A.2d 74:

Although special benefit assessments were first utilized to finance certain capital improvements, typically elements of the infrastructure of local government, special benefit assessments may also be used to finance the operating expenses of local government for services beneficial to property in an area. *See Pumphrey v. County Comm'rs of Anne Arundel County*, 212 Md. 536, 130 A.2d 297 (1957) (rejecting landowner's challenge to a benefit assessment for garbage collection imposed against realty occupied by tenant); *City of Seattle v. Rogers Clothing for Men, Inc.*, 114 Wash.2d 213, 787 P.2d 39 (1990) (sustaining special assessment for promotional activities, cleaning, decorating, and security in the central business district of Seattle). *See generally* O. Reynolds, Jr., *supra*, § 15, at 38.

The Court also considered the status of special taxing districts in *Barlow v. Friendship Heights Citizens' Committee*, 276 Md. 89, 344 A.2d 415 (1975). There, it noted that the Friendship Heights Special Taxing District, by statutory definition, is not a municipal corporation "nor can it be, because it exercises no political powers." *Id.* at 92, 344 A.2d 415. It went on to say that, "[i]f the Committee can be categorized at all, it would be as a quasi-municipal corporation,[1] to which has been transferred a segment of the State's power, in order that a particular purpose may be accomplished." *Id.* at 92–93, 344 A.2d 415. *See also Friendship Heights and the Hills v. Funger*, 265 Md. 339, 342–43, 289 A.2d 329 (1972) (observing that Article 23A exempts special tax districts from the definition of a "municipal corporation.").

Appellant asks us to hold, as a matter of first impression, that the board of directors of a special taxing district authority cannot set its own quorum for meetings. We decline to do so, for a number of reasons.

First, as appellees indicate, it can be difficult to procure participants for volunteer organizations. With this in mind, appellant seems to have overlooked that the quorum of nine actually protects the public from the potential for the conduct of a Board meeting with fewer than nine voting members. As the City points out, the size of the voting membership of the Board is not fixed. If, because of temporary vacancies on the Board—which can happen with almost any volunteer organization—the Board's active membership were less than nineteen members, and a quorum were defined as a majority of the voting members, as appellant suggests, the result could be a quorum of less than the nine presently required. By setting the quorum at nine, the District's residents are assured that there will be a reasonable number of voting members participating in the decisions of the Board.

Second, we are not persuaded by appellant's claim that a nine-member quorum undermines representative government. The Authority does not itself "conduct the business of setting a Supplemental Tax rate and [spend] the tax." It is the Board of Estimates which must approve the actions of the Board in regard to the Surtax. This extra layer of approval allows people such as appellant to express concerns about the Board's actions to an elected body prior to any binding effect. Indeed, that is exactly what happened in this case; Ms. Floyd raised her concerns about the Board's action to the Board of Estimates before the latter body approved the 2007 Budget.

## IV.

Before turning to the next contention, we shall review some additional, undisputed facts pertinent to the parties' contentions.

As we indicated earlier, the District is divided into four quadrants, or Quads, each of which is allotted an at-large

voting seat on the Board. *See* Bylaw 2.07 Quad representatives serve for one-year terms, commencing on January 1 in the year following their election to the Board. Bylaws 2.07(A) and 2.08. On October 18, 2005, when the Board conducted elections for at-large Quad seats, Tammy Mayer was elected to fill the Quad 4 Board seat as of January 2006. By November 2005, however, Ms. Mayer had decided not to assume a seat on the Board in January 2006. Accordingly, on December 13, 2005, the Board chose Mr. Gervais for the Quad 4 seat. He resides in Quad 4 and is registered to vote within the District.[25]

At trial, the Authority presented evidence in the form of a chart showing who held the voting and non-voting seats on the Board as of December 13, 2005, April 11, 2006, and June 21, 2006. That chart indicated that on December 13, 2005, the Quad 4 seat was vacant.

Bylaw 2.09 authorizes the Board to fill vacancies created by the "resignation, expiration, or other departure from the Board" of a member who was not appointed by an elected official (*i.e.*, the Mayor or City Council) or by an association (*i.e.*, the constituent business and community associations within the District). Because Quad representatives hold seats based on elections, rather than appointments, Bylaw 2.09 applies to Quad seats that become vacant. Under Bylaw 2.09, a person appointed to such a vacancy only serves "until the next annual meeting or such earlier or later time as his successor is elected and qualifies."

Appellant contends that Gervais was not properly named to the Board because on December 13, 2005, "the 2005 Voting Board" lacked "the authority to elect Michael Gervais to the 2006 voting Board." Even if the quorum is nine (as we have determined), appellant argues that the Board lacked a quorum when it appointed Gervais to the Board on December 13, 2005, and that a quorum was required for any action not taken

---

**25.** On April 11, 2006, Gervais moved the adoption of the Supplemental Tax rate of $.12 per $100 of assessed value for FY 2007.

under Bylaw 2.09. She points out that only nine Board members were present at that meeting and one, Friedman, was not authorized to vote, because he was not a lawful Board member on that date.

Appellant also challenges the Authority's belated reliance on Bylaw 2.09. Based on the minutes, she asserts that the Board did not rely on that provision to authorize Mr. Gervais's election, and it cannot do so "retroactively" to "legitimize" the election.

Even if the Board had relied on Bylaw 2.09, argues appellant, such reliance would have been misplaced. According to appellant, the Board can only invoke Bylaw 2.09 when a member has departed or resigned from the Board, resulting in a "vacancy" on an "actual, sitting Board." In her view, Ms. Mayer's decision not to assume her seat on the Board, following her election, did not create a "vacancy" on the 2005 Board because Ms. Mayer never became a member of the "2005 Board"; her term would not have started until January 2006. In this regard, Floyd points to the testimony of Jennifer Martin. When Martin was asked if Ms. Mayer had ever actually taken her seat on the Board as of December 13, 2005, she replied: "No, her term didn't start until January of 2006. . . ." Appellant continues: "As there was no 'vacancy' created on the 2005 Board by Ms. Mayer's withdrawal, there was no action for the 2005 Board to take under By-law 2.09."

Therefore, appellant contends that the circuit court "erred" when it "agreed that the 2005 Board had acted under By-law 2.09 pursuant to Ms. Mayer's withdrawal when it elected Mr. Gervais to the 2006 Board." She explains: "An obvious difficulty with this interpretation and application of By-law 2.09 is the assigning of vacancy-filling authority *to the wrong Board.*" Appellant asserts: "The relevant portion of By-law 2.09 provides only for replacement of a sitting Quadrant representative. Quadrant representatives are chosen during the preceding calendar year by an electorate. By-law 2.09 may not be construed to provide an *alternate* means of

electing a Quadrant representative for the coming year, by-passing the electorate."

Floyd elaborates:

Assuming ... that an individual elected to the 2006 Board can be considered to have "resigned" or "departed" in November of 2005 without ever having taken his or her seat, and can be construed as creating a "vacancy" thereby, then any such "vacancy" would occur only in the 2006 Board. Only the 2006 Board would be depleted by such an act, and only the "remaining members" of the 2006 Board would have the power, if any, to replace that individual under By-law 2.09. Of course, those "remaining" members would be the prospective 2006 Board members who had not yet taken their seats as of December 13, 2005 and would have no ability to act, whether to replace a member or otherwise, until *after they had taken their seats in January.* Thus, even assuming that By-law 2.09 could have been used to replace a Quadrant representative who had never taken her seat and never served, this power could only have accrued to the 2006 Board, and could only have been exercised after the 2006 Board was in place in January.

Claiming that Bylaw 2.09 does not permit the Board to bypass the electorate in selecting a Quad representative, Floyd also asserts:

[A]n entirely different procedure had been used in 2002 to replace an individual who was unable to serve after an October election. On that occasion, it was acknowledged at a November 2002 Board meeting that a Quadrant election winner was not qualified to take her seat, and a new election would have to be held prior to the end of the calender year. At a special December meeting, the Board decided to hold a new election to fill the proposed vacancy. . . .

Appellees regard appellant's position as untenable. The City asserts: "It was reasonable and in conformity with the policies expressed in the Charter and the ordinance for the lower court to construe [Bylaw] § 2.09 as permitting replace-

ment of Ms. Mayer with Mr. Gervais." In addition, it contends that "a quorum is not needed to fill a vacancy, only a majority of the remaining directors." According to the City, on December 13, 2005, when the remaining members of the Board acted under Bylaw 2.09 to fill Ms. Mayer's position, nine of the remaining eleven voting members of the Board—more than a majority—voted to replace Ms. Mayer with Mr. Gervais. Assuming, *arguendo,* that Friedman and Burnham were not proper members of the Board, the City notes that seven other Board members voted for Mr. Gervais, i.e., more than the five required to fill a vacancy.

Appellees also dispute Floyd's claim that there was no "vacancy" on the Board for Mr. Gervais to fill. The Authority asserts: "Whether *Ms. Mayer's* resignation amounted to a 'resignation, expiration or other departure from the Board' is really the wrong question." The correct question is simply whether the Quad 4 seat was vacant by virtue of a resignation, expiration, or other departure of the Board member who preceded Mr. Gervais in the Quad 4 seat." According to the Authority, the

> vacancy in December 2005 was, strictly speaking, not the result of Tammy Mayer's withdrawal, because she would not have taken her seat on the Board until 2006. The vacancy in December 2005 existed because whoever had previously been in that seat had self-evidently departed from the Board some time before the December 13, 2005 Board meeting. . . .

When Tammy Mayer was elected in October 2005 it was expected that she would assume the Quad 4 seat in January 2006, and therefore there was no need to use Bylaw 2.09 to fill the Quad 4 vacancy for the short period between her election and her anticipated installation on the Board. When Ms. Mayer resigned in November, however, the situation changed. The Board then needed to fill the vacant Quad 4 seat. It was only because of Ms. Mayer's resignation that the Board needed to act under its Bylaw 2.09

**444**

authority.[26]

Appellees also dispute appellant's claim that another election was required to fill the vacancy on the Board. Indeed, they assert that appellant has not pointed to any rule, regulation, or bylaw requiring an election.[27] Moreover, they challenge appellant's argument that the "2005 Board" lacked the power to appoint a member of the "2006 Board," stating:

First, the distinction between the '2005 Board' and the '2006 Board' is an artificial one. There is no such compartmentalization of Boards by calender year in the Ordinance or Bylaws. The fact is that most Board members serve two-year staggered terms. Ordinance § 6–6(d)(2); Bylaw 2.08. . . . Notably, the roster of the Board in December 2005, when Mr. Gervais was appointed, was much the same as it was in April 2006, when the Board, including Mr. Gervais, voted on the FY 2007 budget and Surtax rate. . . .

Second, there is nothing in the Bylaws, Ordinance or Enabling Law that prohibits a Board in 2005 from making

---

**26.** The Authority recognizes that this is not the reasoning on which the circuit court relied in determining that Mr. Gervais was lawfully appointed to the Board. But, it maintains that this Court may "rely on any proper basis that appears in the record to affirm the trial court's judgment." *See Offutt v. Montgomery County Bd. of Educ.*, 285 Md. 557, 563 n. 3, 404 A.2d 281 (1979) ("An appellate court may, on a direct appeal, affirm a trial court's decision on any ground adequately shown by the record, even though not relied on by the trial court or the parties.")

**27.** The Authority acknowledges that the Board held an election in 2002 to fill a vacancy, but it distinguishes that situation from the one in 2005 that led to Mr. Gervais's appointment. As the Authority explains, in October 2002, Debra Dodd was elected to the Quad 2 Board seat, but after the election the Board discovered she lived in Quad 1. Appellee asserts:

What happened in 2002 was that a flawed election process produced a flawed, and illegal, result. The Board therefore held a new election. By contrast, in 2005 Tammy Mayer was duly elected to Quad 4. There was no flaw in the election process. When she resigned before her term started, that created the prospect that the Quad 4 seat, already vacant, would remain vacant for yet another year unless the Board took steps to fill it.

an appointment that will commence in 2006. To the contrary, the Bylaws plainly contemplate that a Board may appoint members whose terms will commence in the following year....

Third, if there were a legitimate distinction between the 2005 and 2006 Boards, such that only the Board in 2006 could appoint Mr. Gervais to a seat starting in January 2006, that issue was fully resolved by the Board on June 21, 2006, when it adopted a resolution pursuant to which the board, in 2006, fully ratified and affirmed Mr. Gervais's appointment to Quad 4.

In her reply brief, appellant argues: "The issue of Mr. Gervais' eligibility to move the adoption of the Supplemental Tax, and to vote on the matter, rests on the circumstances of his appointment to the Board on December 13, 2005." She maintains that the Board lacked a quorum when it named Mr. Gervais to the Board, "even using the number 9 instead of 10 ...," because Mr. Friedman "was neither a resident of the District[] nor a property owner in the District on December 13, 200 5." Further, Floyd argues that, to the extent Bylaw 2.09 sanctioned the Board's action, it was invalid because the "Authority's Board, a governmental body, is a creature of the General Assembly, which has never granted the Authority the power to conduct business with less than a quorum present."

Appellant also takes issue with the Authority's "factually new argument" that Mr. Gervais was selected as a mid-term replacement for a 2005 Board member who vacated her seat. Characterizing the position as a "revisionist explanation," Floyd asserts that "the new argument is plainly contradicted by the history of this action.... The final document in this history is the Authority's own official record of the December 13, 2005 meeting, in the form of the minutes clearly showing that the appointment of Mr. Gervais took place under item 'Nominations of new Board Members for 2006.'"

Finally, appellant argues that a bylaw that permits the sitting Board to specially fill an at-large seat, rather than hold an election, "undermines and contradicts the nature and pur-

pose of the 'at-large' position. She explains: "When the City Council provided the Authority's Board with the ability to contain "4 at-large voting members" . . . the intention could not have been to provide voting seats for Board members themselves to selectively fill by appointment, when *no other voting seats would be filled this way.*"

We conclude that Bylaw 2.09 authorized the Board to appoint Mr. Gervais. As indicated, the text of the Bylaw provides, in part:

> In the event of resignation, expiration or other departure from the Board of a member not appointed by an elected official or an association, a majority of the remaining directors, whether or not sufficient to constitute a quorum, may fill a vacancy on the Board of Directors. A director elected by the Board of Directors to fill a vacancy serves until the next annual meeting or such earlier or later time as his successor is elected and qualifies.

The circuit court held that, pursuant to this provision, Mr. Gervais was properly selected by a majority of the remaining directors "to fill a vacancy occasioned by the departure of the recently elected Quad 4 Board representative, Tammy Mayer." As noted, appellant insists that Mayer's decision to withdraw from consideration did not create a vacancy on the Board, since Mayer never assumed her seat. Even if technically correct, it is of no moment.

Mr. Gervais was appointed to fill a seat on the Board that was to be filled by Ms. Mayer until she decided not to take a seat on the Board. The departure of the individual who preceded Ms. Mayer, and thus held the seat that Ms. Mayer was to fill, was the one who actually created a vacancy on the Board that was later filled by Mr. Gervais. Because Ms. Mayer never assumed a seat, the Board selected Mr. Gervais to fill the vacancy. Appellant does not explain why the Board would hold an election for the Quad 4 seat, and prepare to place the duly-elected Ms. Mayer in that seat, if the seat were not vacant. The fact that the record does not reveal any details about the individual who actually held the Quad 4 seat

before Ms. Mayer was chosen does not mean that there was no vacancy on the Board for Mr. Gervais to fill. Indeed, this assertion contradicts Ms. Floyd's concession at the hearing on the motion to amend judgment, when she said: "[T]here is nothing in the record of this case that explains why [the Quad 4] seat is vacant, we just know that it is vacant."

To be sure, as appellant indicates, the minutes of the meeting on December 13, 2005, show "that the appointment of Mr. Gervais took place under item *'Nominations of new Board members for 2006.'* " But, we do not see how this fact is dispositive; the Bylaws do not require that, in choosing a new member to fill a vacancy, the Board must assign a particular title to its action or explicitly cite the bylaw on which it relies.

We also reject appellant's arguments about the validity of Bylaw 2.09. We have already addressed these same arguments in rejecting appellant's insistence that the quorum for a meeting must be a majority of the authorized voting members of the Board, i.e., ten persons. The Ordinance authorized the Board to pass Bylaws, so long as they do not contradict the Ordinance or the Enabling Law. Appellant points to no such contradictions with respect to Bylaw 2.09; the Board properly employed that provision in appointing Mr. Gervais on December 13, 2005 as the Quad 4 Board representative.

## V.

Richard Burnham served on the Board for five years, including his service as the Board's treasurer for two years. He was appointed by the Old Goucher Business Alliance, one of several constituent organizations within the District that are entitled to appoint two voting members to the Board. *See* Code, Art. 14, § 6–6(e)(4). Of import here, Burnham is the sole owner and president of Graphic Imaging, Inc., a subchapter S corporation engaged in the printing and graphic design business. It is located at 107 East 25th Street, within the District. Graphic Imaging owns the property at that address, for which it pays the Supplemental Tax. *Id.* Nevertheless,

Burnham is not registered to vote within the District, nor does he reside in the District. Appellants' Brief at 24. Rather, Mr. Burnham served on the Board as the representative of a corporation he owns that is subject to the Supplemental Tax.

Appellant challenged Richard Burnham's qualifications to serve as a voting member of the Board, claiming that he was neither a property owner nor a registered voter in the District, as required by Code, Art. 14, § 6–15(b). Moreover, Floyd argued that Burnham was not eligible to serve merely because of his ownership of a Subchapter S corporation, even if the corporation owned property within the District. Appellant urges that, in reaching the contrary conclusion, the circuit court relied on an "incorrect" and "an extremely problematic version of By-law 2.02(B)," which "was never approved by the Board of Estimates."

Citing Code, Art. 14, §§ 6–6(e)(7) and 6–15(b), the City counters that "Mr. Burnham was qualified . . . as the representative of a property owner." It contends that "a person may serve as a voting member of the Board in the capacity of representative of a business that owns property within the District." Noting that a corporation can only act through individual representatives, the City claims that Mr. Burnham was qualified to serve on the Board based on his status as president and sole owner of Graphic Imaging, Inc., a Subchapter S corporation that owns property within the District. In its view, Mr. Burnham "was the representative of a qualified entity that owned property in the District." Appellees also maintain that a 1996 amendment to Bylaw 2.02(B) eliminated any doubt that a corporation owning property in the District has the right to hold a voting seat on the Board through a representative.

We first address appellant's contention that the version of Bylaw 2.02(B) on which the circuit court relied is "falsified" and "problematic." The minutes of the Board of Estimates meeting of May 15, 1996, show that it approved the following amendment to the Authority's Bylaws:

Section 2.02 BI—(iv) An owner of property which is utilized for commercial purposes may designate an individual to represent the owner if: (a) the individual is (1) a tenant of the owner, (2) a corporate officer or partner of the tenant of the owner, or (3) a business representative or agent of the owner, and (b) the Owner authorizes and designates in writing the individual to represent the owner on the Board.

By contrast, the Authority's current published Bylaws, which the court below cited, omits Section "(iv)" and, instead, sets forth the text of the amendment in 2.02(B)(i), underneath the original text of that provision. The official version of Bylaw 2.02, as cited by the circuit court, provides:

B. Unless otherwise required by the Ordinance, the Board shall be subject to the following considerations:

i. At least a majority of the Board shall be composed of owners or representatives of property owners subject to the tax imposed by this subtitle. A voting member of the Board must be eligible to vote in the election under Section 260 of the Ordinance. An owner of property which is utilized for commercial purposes may designate an individual to represent the owner if:

a) The individual is (1) a tenant of the owner, (2) a corporate officer or partner of the tenant of the owner, or (3) a business representative or agent of the owner, and

b) The owner authorizes and designates in writing the individual to represent the owner on the Board.

ii. The Board shall endeavor to maintain representatives on the Board from professionals practicing in the district, the retail merchants within the district, and the tenants of properties in the district; however, no minimum representation from the groups mentioned in this sub-paragraph shall apply; and

iii. Consistent with the encouragement of partnerships between the authority and property owners exempt from

the tax imposed by the Ordinance, the Board is encouraged to consider representation of such partners on the Board.[28]

Regardless of the causes of the discrepancy between the location of what the Board of Estimates approved and where in the Bylaws it was published by the Authority, this does not render erroneous the circuit court's reliance on the published Bylaws. There is no substantive difference between the approved amendment and the published Bylaws that could have influenced the court's rulings.

As we have seen, Bylaw 2.02(B) provides: "A voting member of the Board must be eligible to vote in the election under Section 260 of the Ordinance." Section 260 of the Ordinance, as codified in the Code, provides:

**§ 6–15 Election approval process**

\* \* \*

(b) Eligibility criteria

The following persons are eligible to vote subject to the limitations that no person may have more than 1 vote:

 (1) owners of property within the District which is subject to tax under § 6–8; and

 (2) voters registered to vote within the District.

 We must determine whether these provisions authorized the Board to count Mr. Burnham as a voting member, given that he neither lived in nor personally owned property in the District, but did own a corporation that owned property in the District. In particular, we must ascertain the meaning of the word "owner" in order to determine whether Mr. Burnham could serve as a voting Board member.

 As we noted above, in interpreting bylaws we apply the general principles of contract construction. In this

---

28. We assume that "(iv)" was deleted because insertion of the new text under subheading "2.02(B)(i)(iv)" would not have been consistent with the numbering scheme of the Bylaws. Instead, it was inserted in the existing text of 2.02(B)(i).

process, we construe a contract "as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617 (1995). Moreover, "the primary source for determining the intention of the parties is the language of the contract itself." *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997). Of equal import, we construe the words "consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words." *Id.; see MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995 (2003); *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556, 769 A.2d 948 (2001); *Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194 (2001); *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766, 556 A.2d 1135 (1989). "[C]ontractual intent is determined in accordance with what a reasonable person in the position of the parties at the time of the agreement would have intended by the language used." *Faulkner v. American Cas. Co. of Reading*, 85 Md.App. 595, 605–606, 584 A.2d 734, *cert. denied*, 323 Md. 1, 590 A.2d 158 (1991).

A contract is not ambiguous merely because the parties do not agree as to its meaning. *Fultz v. Shaffer*, 111 Md.App. 278, 299, 681 A.2d 568 (1996). Contractual language is considered ambiguous when the words are susceptible of more than one meaning to a reasonably prudent person. *Ashton*, 354 Md. at 340, 731 A.2d 441; *Calomiris*, 353 Md. at 436, 727 A.2d 358. In determining whether language is susceptible of more than one meaning, courts are not precluded from considering the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution. *United Services Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819 (2006); *Ohio Cas. Ins. Co. v. Chamberlin*, 172 Md.App. 229, 241, 914 A.2d 160 (2007). In applying the above standards, we note that "[t]he interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law, subject to *de novo* review" by an appellate court. *Chamberlin*, 172 Md.App. at 241, 914 A.2d

160; *see Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941 (2004); *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540 (2003); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504 (2003).

█ Appellant urges us to consider the Board's 2004 rejection of a proposed amendment to the Bylaws—a proposal that would have broadened the eligibility standards for voting Board members—as evidence that the representative of an owner of property in the District cannot serve as a voting Board member unless he or she also meets the requirements of Code, Art. 14, § 6–15. Parol evidence is ordinarily inadmissible to vary, alter, or contradict a contract that is complete and unambiguous." *Maslow*, 168 Md.App. at 317, 896 A.2d 408 (quoting *Higgins v. Barnes*, 310 Md. 532, 537, 530 A.2d 724 (1987)). In our view, Bylaw 2.02(B) is unambiguous. Therefore, we decline to consider the "legislative history" proffered by appellant.

The plain meaning of the word "owner" is not restricted to a natural person. It is widely understood that a variety of non-corporeal entities, such as corporations, partnerships, and trusts, are capable of owning real property. The language of the Bylaws, including by reference the language of Section 260 of the Ordinance, does not show any objective intent to restrict the meaning of the word "owner" to include only natural persons. On the contrary, Bylaw 2.02(B)(i)(a) provides that an owner may designate an individual to represent the owner if the owner is a "corporate officer" of the owner. This provision would be rendered meaningless if we adopted appellant's restrictive definition of owner.

Even if we were to consider parol evidence, we would reach the same conclusion. Sparks, the Authority's initial Administrator, testified that corporations that owned property subject to the Surtax were eligible voters in the referendum held to approve the establishment of the Authority. The list of eligible voters included every property in the proposed District, whether it was residential, commercial, nonprofit, or

governmental. Thus, corporations that owned property within the District were provided ballots and allowed to vote, in conformity with the Ordinance.

We concur with the circuit court's conclusion that Mr. Burnham was eligible to vote on April 11, 2006.

## VI.

We next consider a challenge based on Bylaw 5.03. As noted, it provides:

5.03 *Supplemental Tax.*

A. The Board shall recommend to the Board of Estimates the supplemental tax rate each year as part of the financial plan. During the process of adopting the financial plan, the Board shall approve the supplemental tax rate in a separate vote different from the vote of the Board for the purpose of adopting the financial plan.

B. *The supplemental tax rate must be approved by a majority of all of the voting Board members.*

* * *

D. The supplemental tax rate shall remain the same unless a majority of all voting members vote to change it. If a majority of all the voting Board members do not vote to change the supplemental tax rate, then the Board shall submit a financial plan to the Board of Estimates for approval containing the existing supplemental tax rate.

(Emphasis added.)

Appellant insists that Bylaw 5.03(B), requiring "a majority of all of the voting Board members" to approve the Supplemental Tax rate, means that a majority of all authorized voting board members—ten members—had to approve the 2007 Budget. According to appellant, the City Council serves as a "model" for the "intended meaning of the minimum vote requirement of Authority By-law 5.03(B). She contends that because there were nineteen authorized voting Board members on April 11, 2006, ten affirmative votes were required to

adopt an annual Supplemental Tax rate for Board of Estimates approval." In essence, she claims that "the number of votes required for various actions was calculated according to the number of *authorized* members, not the number of members serving at any given time."

Appellant buttresses this contention with a policy argument. She explains that the "public policy inherent in such an interpretation is to protect the Supplemental Tax payers throughout the District from the act of a small number of voting Board members at times when participation on the Board does not, or cannot, meet the 'minimum representation' standards of the City Code." Appellant adds: "It is right that weak participation should hamper the Board's ability to impose a Supplemental Tax throughout the District. The annual voting on financial matters is the most important business to be done by the Authority's Board. It must be done correctly, or not done at all." Appellant concludes that "the Board must sustain a membership sufficient to reach agreement among at least ten qualified individuals as to the following year's Supplemental Tax rate."

In effect, appellant interprets Bylaw § 5.03(B) to require approval of the Surtax by a majority of the number of voting member *positions* authorized by law, rather than by a majority of actual members. Because there were nineteen authorized voting member positions, Ms. Floyd argues that ten votes were needed to set the Supplemental Tax rate, regardless of the number of voting members actually in place at the time of such a vote. Appellant concludes that, while the disqualification of Friedman "does not affect the April 11, 2006 vote if only nine are needed, when the number of qualified voters is correctly fixed at ten, the loss of Eric Friedman, the tenth voter, voids the approval of the FY 2007 Supplemental Tax." [29]

The City responds that the "plain meaning" of Bylaw 5.03 requires a majority of all current, existing voting members, an

---

[29]. As noted, in its Amended Judgment the circuit court found Friedman ineligible to serve as a voting Board member. Appellees do not challenge that ruling.

interpretation "consistent ... with the realities of volunteer organizations, which can often have vacancies among their authorized membership." Further, it maintains that appellant's construction of the phrase "majority of all of the voting Board members" would impermissibly add to the end of the Bylaw the words "positions authorized by law." Further, the City claims that, unless the Board voted to change the tax rate, "it was required to submit to the Board of Estimates a financial plan with the same tax rate as that from the previous year." Noting that the Board did not vote to change the tax rate, it contends:

> Thus, even if Ms. Floyd is correct in arguing that the Authority's Board did not vote properly on the supplemental tax rate, and thus did not "vote to change the supplemental tax rate," Bylaws, § 5.03(D), the Board was required to do exactly what it did—submit to the Board of Estimates a budget utilizing the existing supplemental tax rate.

According to the Authority, appellant's argument "amounts to re-writing the statute, and the trial court rejected it." It adds that, "under Bylaw 5.03(B) a majority vote, however that phrase is interpreted, is required only if the Board wants to change the Supplemental Tax rate. That was not the case here."

Appellant replies that the Board of Estimates may not approve the Authority's budget without action by the Authority's Board, even if the Authority leaves the supplemental tax rate unchanged. Moreover, she asserts that Bylaw 5.03(B) required a majority of the Board's authorized members to approve the 2007 Budget, because the Authority is a "governmental entity," like the Baltimore City Council, and "it is a common practice for governmental entities to require the approval of a full quorum for the passage of important business items."

The circuit court found that a majority of all voting members voted to maintain the existing tax rate. In rejecting appellant's position, it said: "Even if the supplemental tax rate had to be approved by a majority of all the voting Board

members, the Court interprets this by-law provision to mean a majority of all the voting Board members duly elected and/or appointed and eligible to vote at any given time."

On April 11, 2006, there were fourteen voting members on the Board. It follows that eight members constituted a majority of all of the then-existing voting members. Because there were only fourteen voting members in place on April 11, 2006, a vote of nine in favor of the Supplemental Tax was enough to carry the issue. In fact, there were ten voting members present and they unanimously agreed to retain the current tax rate.

■■■■ The 2007 Budget consisted of two proposals: a financial plan and a supplemental tax rate. The Board held separate votes on these two components, and unanimously approved both. Bylaw 5.03(D) requires the Board to "submit a financial plan to the Board of Estimates for approval containing the existing tax rate." But, Bylaw 5.03(D) only requires the Board to approve the supplemental tax rate if it seeks to change the rate. The Board left the rate unchanged, so it did not have to hold a vote on the Supplemental Tax. Consequently, no matter how we construe the meaning of the word "majority" in Bylaw 5.03(B), which applies to a change in the tax rate, there is no merit to appellant's challenge to the Board's approval of the Surtax.

■■■■ As to the financial plan, the number of Board members required to approve the plan is not fixed by Bylaw 5.03(B); that bylaw applies only to the vote on the Supplemental Tax rate. Instead, Bylaw 2.12 applies to the vote on the financial plan. It sets nine voting members as the quorum for Board meetings and also states: "The act of a majority of *voting members in attendance* at a Board of Directors meeting at which a quorum is present shall be the act of the entire Board of Directors." (Emphasis added). As we concluded above, a quorum of nine members was present at the Board's April 11, 2006 meeting, and a majority of "voting members in attendance" voted to submit the financial plan containing the

existing tax rate to the Board of Estimates, in accordance with Bylaw 2.12.

**APPEALS OF STEPHEN GEWIRTZ AND PAMELA WILSON DISMISSED. JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT JOAN FLOYD.**